**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

| | |
|---|---|
| SFR SERVICES L.L.C. | ) |
| | ) |
| Plaintiff, | ) Case No: |
| | ) |
| v. | ) |
| | ) |
| ARNESEN WEBB, PLLC d/b/a | ) |
| ELEVATE LEGAL SERVICES, PLLC f/k/a | ) |
| ARNESEN WEBB, P.A., | ) |
| JAY ARNESEN, and PARIS WEBB, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, SFR Services L.L.C. ("SFR"), by its undersigned counsel, files this Complaint and Demand for Jury Trial against Defendants, Arnesen Webb, PLLC d/b/a Elevate Legal Services, PLLC f/k/a Arnesen Webb, P.A. ("Arnesen Webb"), Jay Arnesen ("J. Arnesen), and Paris Webb ("P. Webb, and collectively, "Defendants"), and in support thereof, alleges as follows:

### I.  INTRODUCTION

1. This is a case about Defendants abusing their attorney-client relationship with SFR, reaping millions of dollars in attorneys' fees related to first-party property damage litigation over the years, only to cause SFR to suffer significant monetary harm. The substantial damages are in excess of $1 million and encompass the following damages categories: (a) the dismissal of hundreds of lawsuits, requiring SFR to pay attorneys' fees and costs to insurance carrier defendants and their counsel; (b) SFR's internal company costs paying employees and staff to manage the cases prior to dismissal, attend corporate representative depositions, mediations, arbitrations, and pay for other case-related costs; (c) filing meritless charging liens after SFR terminated Defendants

for cause, which prevented the distribution of settlement proceeds to SFR, its counsel, and homeowners so roofs can be built for consumers; (d) attorneys' fees SFR paid and currently is paying counsel to wind up and triage voluminous matters improperly handled by Defendants; and (e) funds that Defendants never paid SFR pursuant to valid letters of protection after certain lawsuits settled.

2. The onslaught of damages stemmed from a Fourth District Court of Appeal case styled *The Kidwell Group, LLC d/b/a Air Quality Assessors of Florida a/a/o Ben Kivovitz v. United Property & Casualty Insurance Company*, 343 So. 3d 97 (Fla. 4th DCA 2022). The appellate opinion was issued on June 15, 2022.

3. Pursuant to Section 627.7152 of the Florida Statues, an assignment agreement must be in writing, executed by the assignor and the assignee. The assignor is typically a homeowner-insured and the assignee is usually a contractor performing services as a result of property damage. The parties' intention and the purpose of such an agreement is for the contractor to step into the shoes of the insured concerning his or her insurance claim. Section 627.7152 also requires the assignment agreement to contain a written itemized, per-unit cost estimate of the services to be performed by the assignee.

4. In *Kivovitz*, the appellate court held the assignment agreement was invalid because the alleged estimate attached to the Complaint was unexecuted and dated five (5) days after the date of the agreement in violation of Florida law. Thus, the Court affirmed the trial court's dismissal of the case. This case had wide sweeping consequences for contractors that rely on assignment of benefits agreements with homeowners to perform work after a homeowner incurs property damages from a storm or other weather-related event.

5. Critically, many of SFR's assignment agreements were allegedly deficient due to issues regarding whether a written itemized, per-unit cost estimate of the services to be performed by the assignee was included with the assignment agreement. Defendants knew (or should have known) this prior to the commencement of the cases, and certainly were aware of this fact after the *Kivovitz* court issued its opinion.

6. Even though Defendants knew or should have known many of the cases they filed for SFR were doomed, Defendants elected to litigate the matters anyway. This ill-advised and negligent strategy forced SFR's personnel and the insurance carrier's attorneys to incur significant legal expenses related to arbitrations, mediations, corporate representative depositions, extensive motion practice, depositions of third-parties, and voluminous document requests.

7. When it became apparent that Defendants could no longer properly handle the volume of cases for SFR, Defendants made excuses for its conduct, and raised the global legal issues with the cases they filed for SFR (which were or should have been known since the enactment of Section 627.7152).

8. In retrospect, this conduct demonstrated Defendants accepted too many SFR cases, could not financially support SFR's litigation inventory due to Defendants' contingency fee representation on all files, and its inability to proficiently handle all of SFR's legal matters.

9. The post-*Kivovitz* era made matters worse. Defendants continued with their aggressive litigation strategy without materially and substantially discussing the ramifications with SFR. Continuing to prosecute the lawsuits required SFR to pay its corporate representatives to attend depositions, to pay employee and staff salaries, and vendor costs to manage the litigation.

10. Ultimately, Defendants dismissed hundreds of lawsuits in favor of the insurance carriers, exposing SFR to significant attorneys' fees and costs. Saddled with attorney fee and cost

exposure on dismissed cases, and the laissez-faire manner in which Defendants continued to represent SFR on files they did not dismiss, SFR was forced to terminate Defendants for cause.

11. After SFR terminated Defendants for cause, Defendants doubled down on their misconduct by filing baseless and blanket charging liens on all of its SFR files, not only cases where litigation was ongoing, but also on cases which were dismissed or otherwise resolved. And, upon information and belief, Defendants filed certain charging liens on cases they apparently acquired from a law firm that merged with Arnesen Webb. However, at the time of the purported merger, Defendants did not follow the Florida Rules of Professional Conduct to continue to represent SFR regarding the predecessor law firm's SFR files. Filing charging liens in this context was wholly improper.

12. At the time the alleged charging liens were filed, Defendants had already caused SFR significant damages because it owed the insurance companies and their counsel substantial attorneys' fees and costs for dismissing hundreds of lawsuits.

13. With respect to Defendants' representation of SFR on litigation matters before Defendants' termination for cause, their conduct and demeanor with defense lawyers in the cases at issue often emboldened insurance companies not to settle.

14. This litigation will not only demonstrate how none of the legal work by Defendants on the cases at issue resulted in contingency fees owed, but SFR's damages substantially outweigh any claimed attorneys' fees that Defendants could ever claim are owed here.

15. Moreover, SFR has recently learned that Defendants are apparently endorsing and depositing checks made payable to SFR without remitting the costs SFR is owed under letters of protection, which are agreements between homeowners and SFR whereby SFR agrees to receive payment for its services after a case concludes.

16. Upon information and belief, Defendants have possession of all the letters of protection, yet refuse to honor them when a case settles. Instead, Defendants in many instances sent all of the settlement proceeds to the homeowner, which prevents SFR from being paid for its services when homeowners withhold payment. Defendants' conduct in this regard has caused SFR to incur substantial damages as well.

17. SFR commenced this lawsuit to remedy the wrongdoing by Defendants, and to recover the money it is rightfully owed.

18. SFR retained the undersigned counsel to represent its interests in connection with the above-captioned case, and is obligated to pay undersigned counsel reasonable attorneys' fees and costs for services rendered.

## II.     PARTIES, JURISDICTION, AND VENUE

19. At all times material hereto, SFR was and is a Florida limited liability company duly registered and authorized to do business throughout the State of Florida, with its principal address located in Martin County, Florida. Plaintiff has one member, Ricky McGraw, a citizen and resident of Puerto Rico.

20. Arnesen Webb a Florida professional limited liability company with its principal place of business in Palm Beach County Florida and all of its members reside in Florida. Thus, Arnesen Webb is a citizen of Florida.

21. J. Arnesen is an individual residing in Broward County, Florida and is otherwise *sui juris*.

22. P. Webb is an individual residing in Palm Beach County, Florida and is otherwise *sui juris*.

23. Venue is proper in the United States District Court for the Southern District of Florida under 28 U.S.C. § 1391(b)(2), because it is where the cause of action accrued, where the Defendants' business is located and where many of the witnesses reside and/or do business.

24. This Court has subject matter jurisdiction under 28 U.S.C. §1332 because the amount in controversy exceeds $75,000.00, exclusive of fees, costs, and interest, and is between citizens of different states.

### III.  FACTUAL BACKGROUND

**A.  Assignment of Benefits (AOB) Agreements Are Statutorily Regulated in Florida.**

25. AOBs are frequently used in the property damage industry to make the claims process more efficient for the homeowner and the contractor. Fundamentally, an AOB is a written agreement that permits an insured to voluntarily assign his or her rights and insurance benefits to a third-party contractor.

26. Once signed, the contractor "steps into the shoes" of the policyholder and allows the contractor (i) to discuss the insurance claim with the carrier; (ii) to bill the insurer directly for work performed and materials furnished for the benefit of the insured; (iii) to be paid directly by the carrier; and (iv) if necessary, commence an action against the insurance company to collect amounts due and owing to the contractor.

27. AOBs are not new and have been used for a long time, especially during emergency weather situations. In Florida, AOBs are prevalent in the residential property context when homeowners suffer damage to their home and need to hire contractors to repair the issues.

28. When damage does occur, immediate remediation is often required to protect against further storms, water leakage, or other types of damage and allows a homeowner to continue to reside on the property while preventing further damage to the home.

29. Here, AOBs are regulated in Florida pursuant to Section 627.7152 and 627.7153 of the Florida Statutes. These laws became effective in 2019 and were a direct legislative response to Office of Insurance Regulation (OIR) reports concerning litigation trends related to AOBs for property insurance claims, the alleged increases in costs related to such litigation, and the corresponding purported surges in annual policy premiums.

30. Homeowners typically exercise their AOB rights under their insurance contracts so the contractors making the repairs can handle the claim without the need for a homeowner's constant involvement with the insurance company, an approach that many homeowners find preferable.

31. Many homeowners lack extensive familiarity or experience with the claims process, which can be daunting and stressful. AOBs also allow repairs to be made without the homeowner fronting the cost of the remediation and then seeking reimbursement from insurers.

**B.    SFR Retains Arnesen Webb to Prosecute First-Party Property Damage Claims**.

32. On February 4, 2019, SFR and Arnesen Webb signed a Retainer Agreement for legal services with respect to the law firm's agreement to prosecute lawsuits on behalf of SFR, as assignee of homeowners' insurance policies. A copy of the Retainer Agreement is attached hereto as **Exhibit A**.

33. The Retainer Agreement was a contingency fee contract whereby Arnesen Webb was only entitled to attorneys' fees if it recovered money on behalf of SFR. Additionally, the parties agreed that the law firm would request its fees to be paid by the insurance carrier. In many instances, the insurance company was statutorily required to pay for a Plaintiff's attorneys' fees in the event the Plaintiff prevailed regarding its lawsuit.

34. Regardless, the law firm's fees were calculated in three ways: (a) the amount of attorneys' fees awarded by a court, including all contingent fee multipliers; (b) the amount of attorneys' fees the insurance company agreed to pay Arnesen in connection with a settlement; or (c) Arnesen Webb's hourly rate for services rendered multiplied by the number of hours expended in the representation of SFR, whichever was greater. If no recovery occurred, SFR was not responsible to pay any attorneys' fees or costs.

35. Over the course of the parties' four (4) year relationship, SFR retained Arnesen Webb to prosecute thousands of files related to first-party property damage claims.

C. **Arnesen Webb's Volume of SFR Cases Was Too Much for the Law Firm to Properly Handle**.

36. While 2019-2021 was not without its challenges in terms of Arnesen Webb representing SFR, 2022 proved to be the most difficult because Arnesen Webb's litigation portfolio for SFR totaled approximately 1,000 cases. In retrospect, Arnesen Webb did not have sufficient attorney and staff support to handle all of SFR's legal matters properly and competently.

37. In fact, on March 30, 2022, J. Arnesen, on behalf of Arnesen Webb, e-mailed SFR and confirmed the law firm was then handling approximately 1,000 cases. The law firm acknowledged virtually every one of these cases was highly contested, and that it "greatly underestimated" the difficulty in litigating contested matters, especially against Tower Hill and UPC. Insurance carriers such as St. John's, Anchor, and Edison also proved to be highly litigious as well.

38. When Arnesen Webb actually had to litigate instead of quickly settle files, it complained to SFR about the significant money, time, and resources it needed to expend on SFR's cases, including paying for costs – all of which it agreed to pursuant to the Retainer Agreement.

39. On April 26, 2022, P. Webb, on behalf of the law firm, e-mailed SFR to further complain about the legal landscape and the posture of SFR's files in an effort to rationalize why it was not working to maximize recoveries.

40. Arnesen Webb was apparently hemorrhaging resources representing SFR at this point, and attempted to justify why it needed to prioritize settlements. Litigation of SFR's files became "too hard" for the law firm. To justify settling cases, Arnesen Webb stated to SFR (a) its AOBs were invalid under Florida law; and (b) the insurance claims were reported to the insurance carrier too late. Yet, when Arnesen Webb agreed to represent SFR on thousands litigation files from 2019-2021, these excuses did not often occur. Only when the cases became contested did Arensen Webb voice its concerns to pressure SFR to settle.

### D. The *Kivovitz* Decision Should Have Caused Arnesen Webb to Change its Litigation Strategy.

41. On top of all of the excuses through the first half of 2022, the Fourth District Court of Appeal entered a decision on June 15, 2022 that substantially changed the legal landscape. The decision was *The Kidwell Group, LLC d/b/a Air Quality Assessors of Florida a/a/o Ben Kivovitz v. United Property & Casualty Insurance Company*, 343 So. 3d 97 (Fla. 4th DCA 2022). As explained above, this decision confirmed many of SFR's cases handled by Arnesen Webb involved invalid AOBs, which devastated the likelihood of the law firm successfully resolving SFR's remaining matters.

42. On June 17, 2022, P. Webb e-mailed SFR to explain the impact of the decision, but nevertheless recommended the continued litigation of the files to attempt to settle the cases.

43. In reality, Arnesen Webb knew about these issues for years, but the appellate court's decision changed the outlook of Arnesen Webb's chances of success with its remaining litigation files.

44. Instead of devising an exit strategy for SFR to resolve the pending matters, Arnesen Webb advised SFR a few weeks later via e-mail that it would no longer pay for costs on cases and SFR needed to make the decision which cases the law firm would take to trial. At this time, J. Arnesen also advised SFR that the *Kivovitz* decision would embolden insurance companies and their lawyers to file motions to dismiss, motions for summary judgment, and, at trial, motions for directed verdict based on the alleged invalidity of SFR's AOBs.

E.  **Arnesen Webb Dismisses Hundreds of SFR's Lawsuits**.

45. Despite the entry of the *Kivovitz* decision, Arnesen Webb elected to continue prosecuting SFR's AOB cases, which required SFR to expend significant costs paying for arbitrations, mediations, transcripts from corporate representative depositions (of SFR and the insurance carrier), as well as depositions of third-parties. These practices continued through the end of 2022 at a great financial expense to SFR, which should never have occurred.

46. On top of incurring these significant costs post-*Kivovitz*, Arnesen Webb also elected to dismiss hundreds of cases from June 15, 2022 – December 2022. Indeed, the vast majority of the dismissals occurred within ninety (90) days after the entry of the *Kivovitz* decision.

47. Remarkably, Arnesen Webb dismissed SFR's lawsuits in bulk without explaining to SFR the full ramifications of these actions. As a result of the dismissals, SFR had to pay significant attorneys' fees and costs to the insurance carrier defendants and their lawyers.

F.  **SFR Discharges Arnesen Webb for Cause**.

48. After SFR realized the harm committed by Defendants, and the actions by Arnesen Webb in dismissing SFR's cases in bulk, SFR discharged Arnesen Webb for cause.

49. On January 7, 2023, SFR e-mailed P. Webb and J. Arnesen discharging SFR for cause. SFR stated the above conduct warranted termination.

50. Additionally, the law firm's lack of communication on files, and consistently ambushing SFR to abandon a case within a week or two of trial was unacceptable. Significantly, SFR also discharged the law firm due to Arnesen Webb often threatening SFR it would not take a case to trial unless SFR paid for all trial costs, which was a breach of the parties Retainer Agreement.

51. On January 12, 2023, SFR e-mailed P. Webb and J. Arnesen again, reiterating that SFR terminated the law firm for cause because Arnesen Webb's attorneys continued litigating files. At this point, the law firm did not file Motions to Withdraw or otherwise seek stays of litigation pending the substitution of new counsel.

52. On January 13, 2023, Arnesen Webb sent SFR a letter responding to the termination for cause, and attempted to justify its malfeasance. Indeed, for the first time, Arnesen Webb acknowledged the overwhelming majority of the pending AOB cases were doomed. Such a statement stood in stark contrast to the law firm's litigation mentality prior to dismissing hundreds of cases in bulk.

53. And, despite its own misconduct, Arnesen Webb attempted to profit and capitalize on the litigation posture it created and the ensuing damages it caused to SFR that would follow. In this connection, the law firm conveniently offered to resolve Motions for Fees and Taxable Costs for $2,500 per file (for a total of almost $600,000), and pending cases for contingency fees between 33% and 40% depending on the matter. These terms were grossly different from Arnesen Webb's Retainer Agreement with SFR, and demonstrated the law firm sought to engineer income after improperly handling voluminous files for SFR.

**G.     Arnesen Webb Files Meritless Charging Liens on All of SFR's Cases.**

54.     After SFR discharged Arnesen Webb for cause, the law firm filed meritless charging lien on all of SFR's cases, including cases that it dismissed or were otherwise resolved. This was a calculated tactic by the law firm to strong arm SFR into paying Arnesen Webb more money or else settlement proceeds negotiated by SFR's subsequent counsel would be entangled for a significant period of time, unable to be paid to SFR, its counsel, and homeowners. The Florida Rules of Professional Conduct prohibit this type of conduct. And, upon information and belief, Defendants filed certain charging liens on cases they apparently acquired from a law firm that merged with Arnesen Webb. However, at the time of the purported merger, Defendants did not follow the Florida Rules of Professional Conduct to continue to represent SFR regarding the predecessor law firm's SFR files. Filing charging liens in this context was wholly improper.

**H.     Arnesen Webb Wrongfully Endorsed Settlement Checks for SFR and Failed to Remit Proceeds to SFR on Account of its Letters of Protection**.

55.     As applied in this case, a Letter of Protection (LOP) is an agreement between a homeowner and a contractor whereby the contractor agrees to forego payment until a homeowner's lawsuit against an insurance carrier settles or is otherwise resolved.

56.     Essentially, a LOP is a lien on the proceeds from a lawsuit. While Arnesen Webb handled cases where SFR was the Plaintiff, as assignee of the homeowner, there were also numerous instances where Arnesen Webb represented a homeowner directly as a Plaintiff.

57.     In many of the matters where Arnesen Webb represented the homeowner directly, SFR agree to perform work related to an insurance claim under a valid LOP. Arnesen Webb had actual knowledge of the LOPs and SFR routinely provided copies of LOPs to the law firm so it knew there was a lien on insurance proceeds received through the litigation of insurance claims.

58. Upon information and belief, Arnesen Webb settled lawsuits on behalf of its homeowner clients where (a) SFR held a validly executed LOP; and (b) the law firm had actual knowledge of the LOP and its validity.

59. After the law firm received settlement checks where SFR was a payee, SFR learned there are several instances where Arnesen Webb wrongfully endorsed the check for SFR, remitted the proceeds to its clients, and refused to pay SFR its share of the proceeds for work performed under the LOP. Such conduct is unlawful.

## I.  **Arnesen Webb Caused Substantial Damages to SFR.**

60. Based on the above conduct, the law firm directly caused significant monetary harm to SFR, which exceeds $1 million, and continues to accrue.

61. The substantial damages include the following categories:

    (a) the dismissal of hundreds of lawsuits, requiring SFR to pay attorneys' fees and costs to insurance carrier defendants and their counsel;

    (b) SFR's internal company costs by paying employees and staff to manage the cases prior to the dismissals, attend corporate representative depositions, mediations, arbitrations, and pay for other case-related costs;

    (c) Defendants' filing meritless charging liens after SFR terminated Defendants for cause, which prevented and prevents the distribution of settlement proceeds to SFR, its counsel, and homeowners to build roofs for consumers;

    (d) attorneys' fees SFR paid and currently is paying counsel to wind up and triage voluminous matters improperly handled by Defendants; and

    (e) funds that Defendants never paid SFR pursuant to valid LOPs after certain lawsuits settled.

## CAUSES OF ACTION

### COUNT I – DECLARATORY RELIEF
### (Against Arnesen Webb)

62. Plaintiffs reallege Paragraphs 1 through 61 above as if set forth fully herein.

63. This is an action for declaratory relief against Arnesen Webb. SFR seeks declaratory relief based on the specific and live controversy alleged – namely, whether SFR discharged Arnesen Webb for cause.

64. Plaintiffs believe that the above circumstances alleged in great detail above demonstrate SFR terminated Arnesen Webb for cause.

65. Plaintiffs seek a determination from this Court that SFR terminated Arnesen Webb for cause. Plaintiffs also seek a determination that the parties' Retainer Agreement does not entitle the law firm to the payment of attorneys' fees related to (i) forthcoming case resolutions; and (ii) settlement proceeds not yet disbursed on matters resolved prior to or after its termination due to the damages caused by the law firm.

66. There is a bone fide, actual, present, and practical need for the declaration.

67. The declaration deals with a present, ascertained, or ascertainable state of facts or present controversy as to a state of facts.

68. There is some immunity, power, privilege, or right of SFR that is dependent upon the facts or the law applicable to the facts.

69. There are entities and individuals who have, or reasonably may have an actual, present, adverse, and antagonistic interest in the subject matter of this dispute, either in fact or law.

70. The antagonistic and adverse interests are all before the court by proper process.

71. The relief sought herein is not a request for the Court to give legal advice or to answer questions propounded from curiosity.

14

WHEREFORE, SFR demands that this Court enter a judgment for declaratory relief against Arnesen Webb (a) determining (i) SFR discharged the law firm for cause, which prevents Defendants from recovering attorneys' fees on any of the cases at issue in this lawsuit; (ii) the damages the law firm caused exceed any alleged entitlement to attorneys' fees related to settled matters where the proceeds have not yet been disbursed; and (iii) the Retainer Agreement does not entitle Arnesen Webb to any attorneys' fees on any settlements negotiated by subsequent counsel under the facts of this case; (b) awarding costs to SFR; and (c) together with such other and further relief that this Honorable Court may deem just and proper.

## COUNT II – LEGAL MALPRACTICE
**(Against All Defendants)**

72. SFR reallages Paragraphs 1 through 61 above as if set forth fully herein.

73. This is an action for legal malpractice against Arnesen Webb, J. Arnesen, and P. Webb.

74. J. Arnesen and P. Webb are the equity partners of Arensen Webb, and directed all of the legal strategy and decisions made regarding the litigation the law firm commenced on behalf of SFR.

75. SFR and Arnesen Webb executed a Retainer Agreement for all legal work performed for the benefit of SFR. This Retainer Agreement applied to all files the law firm handled for SFR. A copy of the Retainer Agreement is attached hereto as **Exhibit A**.

76. Upon information and belief, J. Arnesen and P. Webb directed the law firm to dismiss hundreds of lawsuits it filed on behalf of SFR after the *Kivovitz* decision was entered by the Fourth District Court of Appeal. The decision to dismiss hundreds of lawsuits in bulk was not discussed with SFR.

15

77.     Defendants never communicated to SFR the ramifications of these actions and the magnitude of the monetary harm to SFR's business that would result from this decision.

78.     Moreover, post-*Kivovitz*, Defendants continued to prosecute the lawsuits. Instead, the cases should have been dismissed immediately due to the entry of the appellate decision, without incurring any costs, and needlessly causing the attorneys for the insurance carrier defendants to incur substantial fees and costs. These actions exponentially increased the fees and costs incurred by the insurance carrier defendants and their counsel, when Defendants knew or should have known they would dismiss substantially all of SFR's pending AOB actions.

79.     An attorney-client relationship existed between SFR and Arensen Webb, J. Arnesen, and P. Webb. This relationship was express, or alternatively, implied by the facts and circumstances.

80.     SFR subjectively believed that J. Arnesen, P. Webb and Arnesen Webb represented the interests of SFR in connection with SFR's litigation matters. This subjective belief was reasonable based on the above facts and circumstances.

81.     J. Arnesen, P. Webb, and Arnesen Webb had a duty to properly and competently handle all of SFR litigation cases in a manner that would not cause financial harm to SFR.

82.     J. Arnesen, P. Webb, and Arnesen Webb breached their duties to SFR when they continued to prosecute the lawsuits despite the entry of the *Kivovitz* decision. This decision exponentially increased the fees and costs incurred by the insurance carrier defendants and their counsel, when Defendants knew or should have known they were dismissing substantially all of SFR's pending AOB actions. This conduct violated the duties Defendants owed to SFR as SFR's counsel.

83. As a direct and proximate cause of the misconduct by Defendants, SFR has been damaged. These damages include:

   (a) SFR paying significant attorneys' fees and costs to insurance carrier defendants and their counsel to resolve pending motions to tax attorneys' fees and costs after Defendants dismissed voluminous cases they filed on behalf of SFR;

   (b) SFR's internal company costs by paying employees and staff to manage the cases prior to the dismissals, to attend corporate representative depositions, mediations, arbitrations, and paying for other case-related costs;

   (c) settlement proceeds that cannot be disbursed due to Defendants filing meritless charging liens after SFR terminated Defendants for cause;

   (d) attorneys' fees SFR paid and currently is paying counsel to wind up and triage voluminous matters improperly handled by Defendants; and

   (e) funds that Defendants never paid SFR pursuant to valid LOPs after certain lawsuits settled.

84. SFR was also forced and is currently litigating with third-parties regarding numerous motions to tax attorneys' fees and costs as a result of Defendants dismissing voluminous cases. SFR is entitled to recover its attorneys' fees and costs defending and resolving these motions based on the wrongful act doctrine.

WHEREFORE, SFR demands judgment against J. Arnesen, P. Webb, and Arnesen Webb, jointly and severally, for damages, pre-judgment interest, attorneys' fees and costs based on the wrongful act doctrine, costs, together with such other and further relief that this Honorable Court may deem just and proper.

## COUNT III – BREACH OF FIDUCIARY DUTY
**(Against All Defendants)**

85. SFR reallages Paragraphs 1 through 61 above as if set forth fully herein.

86. This is an action for breach of fiduciary duty against J. Arnesen, P. Webb, and Arensen Webb, and is brought in the alternative to Count II.

87. By virtue of the Retainer Agreement, as well as the relationship of trust and confidence that existed between the parties, which was accepted by J. Arnesen, P. Webb, and Arnesen Webb, they owed SFR a fiduciary duty.

88. Defendants owed a duty of care to use that amount of care which ordinary and prudent persons would use in similar circumstances, and considering all material information reasonably available in making legal decisions that would impact hundreds of litigation files handled by Defendants on behalf of SFR.

89. Defendants also owed SFR a duty of loyalty to put SFR's interests first, ahead of the Defendants' self-interest in reaping significant attorneys' fees, and not jeopardizing SFR's matters by pursuing litigation and exponentially increasing case costs globally post-*Kivovitz*. Defendants also had a duty to refrain from exploiting the relationship for Defendants' benefit.

90. J. Arnesen, P. Webb, and Arnesen Webb breached their fiduciary duty(ies) to SFR by continuing to prosecute the lawsuits when Defendants knew or should have known the entry of the *Kivovitz* decision required the opposite action.

91. Defendants prosecuted the cases, which exponentially increased the fees and costs incurred by the insurance carrier defendants and their counsel (as well as internal costs incurred by SFR). J. Arnesen, P. Webb, and Arnesen Webb knew or should have known they would dismiss substantially all of SFR's pending AOB actions. This conduct violated the duties Defendants owed to SFR as SFR's counsel.

92. Defendants also breached their fiduciary duties to SFR by filing meritless charging liens on all of SFR's files when it knew or should have known there was no legal basis for the alleged liens. Upon information and belief, Defendants filed certain charging liens on cases they apparently acquired from a law firm that merged with Arnesen Webb. However, at the time of the purported merger, Defendants did not follow the Florida Rules of Professional Conduct to continue to represent SFR regarding the predecessor law firm's SFR files. Filing charging liens in this context was also wholly improper.

93. Due to the alleged charging liens, Defendants entangled settlement proceeds in numerous cases, which prevents SFR, its counsel, and homeowners from receiving those funds based on resolutions achieved without the assistance of Defendants.

94. Defendants also breached their fiduciary duties by, upon information and belief, disbursing settlement proceeds to homeowners without honoring SFR's valid LOPs. Defendants had these LOPs in their possession and/or knew about the LOPs prior to the resolution of the cases.

95. As a direct and proximate cause of the misconduct by Defendants, SFR has been damaged. These damages include:

(a) SFR paying significant attorneys' fees and costs to insurance carrier defendants and their counsel to resolve pending motions to tax attorneys' fees and costs after Defendants dismissed voluminous cases they filed on behalf of SFR;

(b) SFR's internal company costs by paying employees and staff to manage the cases prior to the dismissals, to attend corporate representative depositions, mediations, arbitrations, and paying for other case-related costs;

(c) settlement proceeds that cannot be disbursed due to Defendants filing meritless charging liens after SFR terminated Defendants for cause;

19

(d) attorneys' fees SFR paid and currently is paying counsel to wind up and triage voluminous matters improperly handled by Defendants; and

(e) funds that Defendants never paid SFR pursuant to valid LOPs after certain lawsuits settled.

96. SFR was also forced to litigate with third-parties regarding numerous motions to tax attorneys' fees and costs as a result of Defendants dismissing voluminous cases. SFR is entitled to recover its attorneys' fees and costs defending and resolving these motions based on the wrongful act doctrine.

WHEREFORE, SFR demands judgment against J. Arensen, P. Webb, and Arensen Webb, jointly and severally, for damages, pre-judgment interest, attorneys' fees and costs pursuant to the wrongful act doctrine, costs, and all other relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, SFR Services, demands a trial by jury on all Counts so triable.

Dated: July 25, 2023

**SHAPIRO BLASI WASSERMAN & HERMANN PA**
*Attorneys for SFR Services L.L.C.*
Corporate Centre at Boca Raton
7777 Glades Road, Suite 400
Boca Raton, Florida 33434
T: (561) 477-7800 || F: (561) 477-7722
jalper@sbwh.law
ecaruso@sbwh.law

By: */s/ Joshua B. Alper*
    Joshua B. Alper, Esq.
    Florida Bar No. 059875